AMERICAN-HAWAIIAN STEAMSHIP CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4225. Promulgated May 20, 1927.

1. Costs subject to amortization determined.
2. Spread of amortization for a fiscal year determined in accordance with income.

*George E. Cleary, Esq.,* for the petitioner.
*John D. Foley, Esq.,* for the respondent.

This proceeding involves income and profits tax of approximately $79,000 for the fiscal year ended February 28, 1919. An assessment in excess of the foregoing amount was made in September, 1924, under the provisions of section 274 (d) of the Revenue Act of 1924 but the petitioner paid a portion of the assessment and filed claim in abatement for $79,000. Upon notice of the rejection of this claim the petitioner duly filed this appeal and did not make payment of the tax on account of which the abatement claim was filed.

No oral testimony was introduced, the entire case being submitted on an agreed stipulation of facts.

### FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of New Jersey, with its principal office in New York, N. Y., and is a successor to the Coastwise Transportation Co., from which corporation petitioner, by merger, on July 30, 1921, acquired all the assets subject to all the liabilities, including Federal income and profits-tax liabilities, of said Coastwise Transportation Co. The Coastwise Transportation Co. was engaged in the business of transporting freight by vessels.

The accounting period of the Coastwise Transportation Co. was a fiscal year ended February 28, and the company reported its income and kept its books on the accrual basis.

In 1915 the Coastwise Transportation Co. entered into an agreement with the New York Shipbuilding Corporation for the construction of a vessel for the sum of $507,500, which vessel was known as *Hull No. 182,* and later as the *S. S. Fairmont.*

Prior to August 3, 1917, the aforementioned vessel had been partly completed and the Coastwise Transportation Co. and the New York Shipbuilding Corporation were ready, able and willing to carry out said contract for its completion.

On August 3, 1917, the United States Shipping Board Emergency Fleet Corporation, acting under the authority of chapter 29, of the Urgent Deficiency Act of June 15, 1917, and Executive order of the President dated July 11, 1917, issued a requisition order to the New

York Shipbuilding Corporation with reference to ten vessels under construction at its yard at Camden, N. J., the material portion of which reads as follows:

All power-driven cargo-carrying, and passenger ships above 2,500 tons d. w. capacity, under construction in your yard, and certain materials, machinery, equipment, outfit, and commitments for materials, machinery, equipment, and outfit necessary for their completion are hereby requisitioned by the United States. On behalf of the United States, by virtue of said act and said order, you are hereby required to complete the construction of said requisitioned ships under construction and will prosecute such work with all practicable dispatch. The Compensation to be paid will be determined hereafter and will include ships, material, and contracts requisitioned. You will furnish immediately general plans and detail specifications of the ships requisitioned, and copies of contracts and all supplemental agreements in relation thereto, and full particulars as to owner, date of completion, payments made to date, amounts still due, and any other information necessary to a fair and just determination of the obligations of the Emergency Fleet Corporation in taking over these ships and contracts. You will report immediately whether any additional contracts are under consideration and their character and extent, and will not enter into any additional contracts or commitments with respect to merchant tonnage without express authority from this corporation.

The *S. S. Fairmont* was included among the vessels referred to and the requisition order was carried out with reference thereto.

After August 3, 1917, the New York Shipbuilding Corporation proceeded to complete the vessel in question by order and direction of the United States Shipping Board Emergency Fleet Corporation. The compensation to be paid the New York Shipbuilding Corporation for the completion of the vessel was fixed in a three-party contract dated December 14, 1917, the parties thereto being the United States Shipping Board Emergency Fleet Corporation, the New York Shipbuilding Corporation, and the American International Corporation, pertinent parts of which follow:

On and prior to August 3, 1917, the Shipbuilding Corporation was constructing under private contract with the corporations named below (hereinafter called "former owners") ships bearing the hull numbers, of the type and for the contract prices set opposite their respective names:

| Hull No. | Type | Corporation | Contract price |
|---|---|---|---|
| 174 | Tanker | Standard Transportation Co | $875,000 |
| 175 | Tanker | Standard Transportation Co | 875,000 |
| 176 | Collier | Darrow Mann Co | 698,900 |
| 182[1] | Coastwise | Transportation Co | 507,500 |
| 183 | Collier | Pocohontas Fuel Co | 369,000 |
| 184 | Collier | Darrow Mann Co | 515,000 |
| 189 | Tanker | Gulf Refining Co | 640,000 |
| 190 | Tanker | Petroleum Transportation Co | 1,010,000 |
| 193 | Freighter | Carpenter-O'Brien Co | 831,630 |
| 196 | Tanker | Gulf Refining Co | 1,045,000 |

[1] Referred to as *S. S. Fairmont* in this opinion.

Due to war conditions, such contract prices have proved and will prove to be less than the actual cost of constructing such ships. On August 3, 1917, all of such ships, together with the materials assembled therefor, were requisitioned by the Fleet Corporation, acting in accordance with the provisions of the Urgent Deficiency Act of June 15, 1917 and the Executive Order of July 11, 1917. The Shipbuilding Corporation by such requisition was directed to complete such ships on behalf of the United States.

The parties hereto desire to fix the just compensation to be paid to the Shipbuilding Corporation in accordance with the provisions of such Urgent Deficiency Act, and to that end the Fleet Corporation is willing to increase such contract prices provided the former owners of said ships respectively, or if any former owner declines, the International Corporation, shall agree to accept retransfer to them respectively or to the International Corporation as the case may be, of said ships upon completion, and, upon such retransfer, repay to the Fleet Corporation its investment as hereinafter set forth, with respect to said ships, including extra costs of all sorts, and shall accept the charter rate prescribed by the United States Shipping Board and other conditions all in accordance with the provisions of this agreement and agreements to be executed, forms of which are hereto annexed and marked Exhibits "A", "B" and "C."

*        *        *        *        *        *        *

The International Corporation is willing on the terms and conditions of this agreement to acquire any or all of the foregoing ships, with the exception of such three transports, in so far as the former owners or persons for whom such ships were being constructed decline, as hereinafter provided, to enter into agreements to accept of retransfers thereof upon the terms and conditions hereinafter stated.

Now, THEREFORE, for and in consideration of the premises and of the mutual agreements hereinafter contained it is hereby agreed as follows:

I.

The Shipbuilding Corporation agrees to complete said Hulls Nos. 174, 175, 176, 182, 183, 184, 189, 190, 193 and 196 in accordance with the specifications annexed to the respective contracts under which such hulls were being constructed for the former owners prior to August 3, 1917, but will comply with all orders as to alterations in the construction or equipment thereof given by the Fleet Corporation or its duly authorized officers.

The Shipbuilding Corporation agrees to proceed with such completion of such ships with all due expedition, and to that end agrees that the Shipbuilding Corporation will not, during the construction of said ships, take any additional contracts for other ships from parties other than the United States Navy, which will interfere with such expedition.

II.

The Fleet Corporation hereby agrees to pay to the Shipbuilding Corporation as just compensation for the completion of said ten ships Hulls Nos. 174, 175, 176, 182, 183, 184, 189, 190, 193 and 196 the entire cost of construction of said ships, figured from the commencement by the Shipbuilding Corporation of the construction of said ten ships up to the times of completion thereof respectively, and in addition thereto with respect to each ship ten Dollars ($10) per dead weight ton for profit. There shall be credited however in favor of the Fleet Corporation all sums heretofore received by the Shipbuild-

ing Corporation on account of the construction of such ten ships respectively, either from the former owners or from the Fleet Corporation. A statement of the amounts so received by the Shipbuilding Corporation as to each such ship is hereunto annexed and marked Exhibit "D". As construction progresses the Shipbuilding Corporation shall deliver monthly to the Fleet Corporation cost statements as to each such ship, covering the construction costs with respect thereto, so far as ascertained, and the Fleet Corporation shall pay to the Shipbuilding Corporation on or before the 15th day of each month the costs incurred during the preceding calendar month. The Fleet Corporation shall pay said profit of Ten Dollars ($10) per dead weight ton; Three Dollars ($3) per estimated dead weight ton at the time of laying the keel of each said ship; Four Dollars ($4) per estimated dead weight ton at the time of launching of each said ship; and Three Dollars ($3) per estimated dead weight ton at the time of delivery of the ship by the Shipbuilding Corporation.

## III.

A determination of the costs of said ships to date with payments of said profit in accordance with the stage of completion of each ship, as aforesaid, shall be made as soon as possible after date hereof, after proper audit by the Fleet Corporation. The costs of each ship shall be stated separately. The Fleet Corporation shall have free access to the books and records and contracts of the Shipbuilding Corporation for the purpose of determining such costs. Final determination of the amount of the Shipbuilding Corporation's said profit shall be made after the determination of the actual dead weight tonnage of each ship, and any necessary adjustments shall then be made. Costs shall be determined as actual costs are defined in the form of agreement constituting Exhibit "C" hereto attached, relating to the construction of the three transports.

## IV.

The Shipbuilding Corporation shall proceed with all reasonable despatch to negotiate with the former owners in the endeavor to obtain from them respectively, in quadruplicate, agreements in form substantially of Exhibit "A" hereto attached.

The Shipbuilding Corporation agrees to use its best efforts to procure said agreements from the former owners respectively, substantially in the form of Exhibit "A", and upon request of the Fleet Corporation shall advise the Fleet Corporation what negotiations the Shipbuilding Corporation has had with each of such former owners with respect to any such agreement. If the Shipbuilding Corporation shall be unable to obtain from such former owners such agreements, the Shipbuilding Corporation shall attempt in good faith to obtain from such former owners respectively, definite refusals, but the Shipbuilding Corporation shall be under no obligation to continue its efforts to obtain such agreements or such refusals beyond thirty days from date.

## V.

In so far as any former owner or owners shall not have executed an agreement in substantially the form of Exhibit "A" within thirty days from the date of this agreement the International Corporation agrees that upon completion, delivery and transfer to it by the United States Shipping Board of the Ship originally contracted for by any such former owner with the Shipbuilding Corporation, it will accept such transfer pursuant to an agreement, with Requisition Charter

annexed, all in form of Exhibit "B" hereto attached, and will execute such agreement as party of the third part. Such agreement shall also be executed by the other three parties as therein indicated. For such transfer the International Corporation shall pay said Fleet Corporation the cost of constructing and completing said ship, plus Ten Dollars ($10) per dead weight ton (all as herein agreed between said Shipbuilding Corporation and said Fleet Corporation) together with six per cent. interest per annum on such amounts as any such former owner may have paid to the Shipbuilding Corporation prior to August 3, 1917 on account of the construction of said ship, pursuant to its contract, and not reimbursed to such former owner on account of such requisition.

*   *   *   *   *   *   *

### IX.

On execution and delivery by the United States Shipping Board, the Fleet Corporation, the respective former owners and/or the International Corporation, of the agreements provided by and included in Exhibits "A" and "B," and "C" hereto attached (as may be indicated by the forms of such agreements), the Shipbuilding Corporation releases the United States, the United States Shipping Board and the Fleet Corporation from any and all liability for additional or other compensation under the provisions of the Urgent Deficiency Act of June 15, 1917, other than the compensation provided to be paid to and received by Shipbuilding Corporation pursuant to this agreement and to the agreements to be executed as provided in this agreement.

### X.

The Fleet Corporation, in accordance with the provisions of the said Urgent Deficiency Act of June 15, 1917, hereby agrees to indemnify and save harmless the Shipbuilding Corporation from any and all loss or liability occasioned by reason of said requisition order of August 3, 1917 or any subsequent acts or orders given by the Fleet Corporation arising out of claims of the former owner or owners or any one claiming under them.

*   *   *   *   *   *   *

### XIV.

The Fleet Corporation hereby agrees, upon completion and delivery by the Shipbuilding Corporation of said ships respectively (except said three transports), to execute and deliver as party of the second part (1) the respective transfer agreements (with Requisition Charter attached) annexed to Exhibit "A", which former owners respectively shall have executed as parties of the third part, and/or (2) transfer agreements in the form of Exhibit "B", which International Corporation shall have executed as party of the third part, as hereinabove provided, and which, in all such cases, the Shipbuilding Corporation shall have executed as party of the fourth part.

On December 27, 1917, the Emergency Fleet Corporation outlined its views to the Coastwise Transportation Co. with respect to *Hull 182 (S. S. Fairmont)* in a letter, the material parts of which read as follows:

At the outset we wish to have you understand our view of this situation, which is as follows:—

1. That title of this ship passed absolutely to the United States on August 3, 1917.

2. That your company has a claim for compensation in money.

3. That the Fleet Corp. has made the effort to secure a return to American owners of requisitioned ships the ships they had contracted for, provided that such owners would pay the extra cost of completing the ships, would operate the same as the agents of the United States during the War and would accept the Shipping Board's requisition charter. This is a pure matter of courtesy on the part of the Fleet Corporation, but in these cases where ships are actually returned, we believe that it is only fair that the persons securing the return of such ships should bear the extra cost that the war conditions have created. It certainly would not be just to the United States to bear the extra burden of completing the ships and return them to the former owners at such a low contract price as stated in your agreement with the Shipbuilding Corp.

The letter from the New York Shipbuilding Corp. was for the purpose of giving you the opportunity of acquiring the ship, but if you would prefer money payment, we shall arrange to reimburse you promptly for all sums you have expended.

On February 15, 1918, four-party contract was entered into by the Coastwise Transportation Co., the United States Shipping Board, the Emergency Fleet Corporation and the New York Shipbuilding Corporation for the transfer of the completed *S. S. Fairmont* to the Coastwise Transportation Co., which contract was carried out. One paragraph of this contract reads as follows:

The United States, represented by the Shipping Board, hereby quitclaims, transfers, sets over, and assigns to the Company all of the right, title and interest of the United States in and to the said ship and its tackle, engines, and furnishings, acquired by the United States, represented by the Fleet Corporation, by its said order of August 3, 1917, or otherwise, to have and to hold the said ship, its tackle, engines, and furnishings to the sole and proper use and benefit of the Company, and hereby delivers said ship to the Company, but subject to each and every of the provisions of this agreement.

The parts of the contract which provide the amount to be paid by the Coastwise Transportation Co. for the transfer of the vessel to it are set out as follows:

The Shipbuilder acknowledges receipt from the Fleet Corporation on various dates since August 3, 1917, of the aggregate sum of $_____ as just compensation for work done in completing said ship, and the Fleet Corporation acknowledges the receipt this day of full reimbursement of said sum from the Company; and the Fleet Corporation agrees to pay to the Shipbuilder all additional sums which may be due the Shipbuilder on account of completing said ship, and the Company agrees promptly to reimburse the Fleet Corporation for all payments so made.

The Company hereby agrees to indemnify the Shipping Board and the Fleet Corporation from any and all liability for any charges heretofore or hereafter incurred for the account of completing said ship, including all charges for changes, additions, and extra or overtime work ordered by the Fleet Corporation, whether or not contemplated in the original contract between the Shipbuilder and the Company, with the exception of salaries and expenses of the Shipping Board or the Fleet Corporation employees.

The Company hereby releases the United States, the Shipping Board, and the Fleet Corporation from any and all liability arising in any way out of the Requisitioning Order of August 3, 1917, and agrees that the full and only just compensation to the Company for any and all claims arising out of said Requisitioning Order, or anything done in connection therewith, shall be as herein stated.

In pursuance of said contract, the Coastwise Transportation Co. (1) on or soon after February 15, 1918, paid to the United States Shipping Board Emergency Fleet Corporation $485,000 in cash, and (2) assumed a liability to the United States Shipping Board Emergency Fleet Corporation of $78,461.20, which was later paid. The Coastwise Transportation Co. paid out not less than $240,303.40 with respect to said vessel prior to August 3, 1917. The claim of the Coastwise Transportation Co. against the United States for just compensation for the requisition of the vessel under the order of August 3, 1917, which was released pursuant to said contract of February 15, 1918, had a value, on February 15, 1918, of not less than $240,303.40. From the foregoing we find the total cost of the vessel on February 15, 1918, to be $803,764.60 made up of the following items:

```
Cash _____ $485,000.00
Assumption of liability later paid_____    78,461.20
Release of claim against U. S. for compensation, worth_  240,303.40
                                                       _____
    Total_____  803,764.60
```

The costs incurred by the Coastwise Transportation Co. prior to April 6, 1917, under its contract with the New York Shipbuilding Corporation in the construction of the *S. S. Fairmont* were $268,502.73, which the Commissioner, in his determination, deducted from the foregoing amount as costs not subject to amortization.

The Commissioner determined the total allowable amortization with respect to the *S. S. Fairmont* as $208,834.50, which was spread over an amortization period starting January 1, 1918, and ending February 28, 1919. The Commissioner determined that 85.205 per cent of the income for such amortization period fell within the calendar year 1918 and in computing the tax for the fiscal year ended February 28, 1919, he allowed: (a) a deduction on account of amortization of $177,937.44 (85.205 per cent of the total amortization) in the computation made under the 1918 rates, and (b) a deduction of $30,897.06 (14.79 per cent of the total amortization) in the computation under the 1919 rates. In auditing the return for the fiscal year ended February 28, 1918, the Commissioner allowed an amortization deduction of $177,937.44 in the computation made under the 1918 rates for that year.

The parties hereto have stipulated the following additional facts:

(a) The period over which the amortization allowance shall be spread terminated February 28, 1919.

(b) The net income of the Coastwise Transportation Company for the fiscal year ending February 28, 1918, excluding any deduction for amortization of the *S. S. Fairmont* was fixed by the Commissioner at $2,098,124.96.

(c) The net income of the Coastwise Transportation Company for the fiscal year ending February 28, 1919 (before deducting amortization and depreciation on costs disallowed) was fixed by the Commissioner at $2,751,418.70.

(d) The residual value of the *S. S. Fairmont* for amortization purposes was not more than $490,168.00.

(e) The dead weight tonnage of the *S. S. Fairmont* was 8,753 tons.

OPINION.

LITTLETON: This proceeding involves two issues:

(1) Whether under the facts the costs subject to amortization should include the costs which had been incurred by the Coastwise Transportation Co. prior to April 6, 1917, under the contract which it had entered into with the New York Shipbuilding Corporation in 1915 for the construction of the *S. S. Fairmont*.

(2) The period over which, and manner in which, the allowable amortization is to be spread.

A third issue was raised in the petition as to the residual value of the *S. S. Fairmont* in postwar use, but the parties have stipulated that such value is not less than $490,168, which, on the basis of $56 per ton on an agreed dead weight tonnage of the vessel of 8,753 tons, is the figure fixed by the Commissioner, and no evidence was introduced as to its actual residual value in postwar use. This value will, therefore, be affirmed, and the point will not be considered further.

In 1915, the Coastwise Transportation Co. entered into a contract with the New York Shipbuilding Corporation for the construction of a vessel at a cost of $507,500. Prior to April 6, 1917, the Coastwise Transportation Co. had incurred costs under this contract of $268,502.73, but had actually expended up to August 3, 1917, only $240,303.40. On August 3, 1917, the United States Shipping Board Emergency Fleet Corporation, acting under statutory authority and an executive order of the President, issued a requisition order to the New York Shipbuilding Corporation on account of certain vessels then in process of construction in the New York Shipbuilding Corporation's plant, among them being the vessel here in question, and proceeded to complete such vessels at a cost in excess of that originally contracted for by the Coastwise Transportation Co.

Subsequently, in recognition of the fact that costs in the construction of the vessels were greater than those originally contracted for, and with the desire to transfer the vessels when completed to

an owner or agency for operation under the orders of the United States Shipping Board Emergency Fleet Corporation, a three-party contract was entered into by the United States Shipping Board Emergency Fleet Corporation, the New York Shipbuilding Corporation, and the American International Corporation, under which the compensation to be paid the New York Shipbuilding Corporation was fixed at a price in excess of that originally agreed upon in the contract between the New York Shipbuilding Corporation and the Coastwise Transportation Co. This contract provided further, that if the former owners of these vessels, i. e., the parties who had contracts with the New York Shipbuilding Corporation for the construction of vessels at the time the requisition order in question was issued, did not avail themselves of the privilege of taking over the vessels when offered to them on the basis of the total cost to the United States Shipping Board Emergency Fleet Corporation, the American International Corporation would take them over on this basis.

In determining the amounts to be paid the New York Shipbuilding Corporation on a cost-plus basis, it was provided that whatever payments had previously been made to it by the former owners should be credited against the total cost in favor of the United States Shipping Board Emergency Fleet Corporation.

On February 15, 1918, the Coastwise Transportation Co. accepted the offer of the United States Shipping Board Emergency Fleet Corporation for the acquisition of the S. S. Fairmont and this vessel was transferred to it, for which the Coastwise Transportation Co. paid $803,764.60 made up as follows: Cash, $485,000; assumption of a liability of $78,461.20 which it later paid; and release of all claims which the Coastwise Transportation Co. had against the Government on account of the requisition of the vessel, which claims the parties have stipulated as being worth not less than $240,303.40, which is likewise the amount which the Coastwise Transportation Co. had paid to the New York Shipbuilding Corporation on account of the work done on this vessel under its original contract at the time the requisition order became effective.

On the basis of the transaction on February 15, 1918, the petitioner contends that the cost of the S. S. Fairmont to its predecessor was $803,764.60 and that this amount, less the value in use of $490,168, is the amortization allowance to which it is entitled, whereas the Commissioner contends that the total costs of $803,764.60 should be reduced by $268,502.72 before determining the amortization allowance since costs to this extent had been incurred by the Coastwise Transportation Co. prior to April 6, 1917, and, therefore, were not costs which were borne by it after April 6, 1917.

The provisions of the statute under which the deduction is claimed is section 234(a) (8), Revenue Act of 1918, and reads in part as follows:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

   \*      \*      \*      \*      \*      \*      \*

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income.   \*   \* · \*

In effect the petitioner says that on February 15, 1918, the Coastwise Transportation Co. acquired the *S. S. Fairmont*, and, therefore, under the above-quoted provision its total cost on that date must govern, regardless of what may have happened in prior transactions, whereas the respondent says that of the costs contended for, $268,502.72 had been *borne* by the Coastwise Transportation Co. prior to April 6, 1917, and, therefore, could not be subject to amortization. It therefore becomes a question of determining the effect of the requisition order of August 3, 1917, and the subsequent transfer of the vessel to the Coastwise Transportation Co. In other words, did the requisition order in question result in the vesting of title to the vessel in its uncompleted state in the United States Shipping Board Emergency Fleet Corporation, and leave the Coastwise Transportation Co. with only a claim for money damages against the United States? And was the transaction of February 15, 1918, an entirely new acquisition with which the former transactions had no necessary legal connection?

Upon a consideration of all the facts in the case, we are convinced that both of the above questions must be answered in the affirmative and that the costs to be considered in determining the amortization allowance are $803,764.60.

Our first question is as to the effect of the requisition order in question. It is not necessary in this opinion to determine in whom title to the uncompleted ship vested prior to August 3, 1917—whether the Coastwise Transportation Co. or the New York Shipbuilding Corporation—but we must determine whether the Government thereby acquired an unqualified right to the vessel. In *Brooks-Scanlon Corporation* v. *United States*, 58 Ct. Cls. 274; 265 U. S. 106, there was before the courts the question of whether when the same requisition order with which we are dealing was issued, the contract

itself for one of the hulls mentioned in the order was expropriated. In considering the case neither court seems to have entertained any doubt that, in so far as the uncompleted vessel was concerned and all materials and supplies which were on hand for the construction of the vessel, title thereto passed unreservedly to the Government. As stated by Chief Justice Campbell in the dissenting opinion of *Brooks-Scanlon* v. *United States*, 58 Ct. Cls. 274:

> When the Government's requisition issued and required completion for its own benefit, agreeing to pay therefor the contract price, diminished, however, by the amount of the payments plaintiff had made, it is conceded that the uncompleted vessel was taken.

Similarly, the Supreme Court in passing on the same case (265 U. S. 106) said:

> By its orders the Fleet Corporation put itself in the shoes of the claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had.

The situation in the case at bar is parallel to that referred to above, in so far as it concerns the legal effect of the requisition order. In the exercise of the power of eminent domain, the Fleet Corporation came into ownership of the *S. S. Fairmont* just as effectively as if it had gone into the market and made an outright purchase thereof. After this, the Coastwise Transportation Co. had no claim against, or lien upon, this vessel. What it had was a claim against the Government for the taking of its property without making just compensation therefor. What it would get was not determined then and had not been determined prior to February 15, 1918. That it was eventually reimbursed for the expenditures which it had made under its original contract with the New York Shipbuilding Corporation does not alter the fact that until the contract of February 15, 1918, was entered into it had merely an unliquidated claim against the Government.

The Commissioner admits that in form the Fleet Corporation got title to the *S. S. Fairmont* through the requisition order and that the Coastwise Transportation Co. acquired the completed vessel on February 15, 1918, but insists, in effect, that, upon looking through form to the substance of the transaction, the costs borne in the acquisition of the vessel which are subject to amortization were not those incurred on February 15, 1918, but those, less certain liabilities incurred prior to April 6, 1917, under its original contract with the New York Shipbuilding Corporation, since liability to pay for work done prior to the war had already been incurred by it, and therefore it could not be said that the costs so incurred had been " borne by the taxpayer " on or after April 6, 1917.

This argument disregards the fact of complete acquisition on February 15, 1918, and would provide for acquisition on this date of only those rights which were in the Fleet Corporaiton as distinguished from those which yet remained in the Coastwise Transportation Co.

This argument does not appeal to us as sound. Prior to February 15, 1918, complete right, title, and interest in the *S. S. Fairmont* was vested in the Fleet Corporation, and on this date the Coastwise Transportation Co. acquired the vessel. If the Coastwise Transportation Co. *acquired* the vessel on February 15, 1918, then when did it bear the cost for its acquisition? We fail to see how the cost could have been borne on any other date. The parties have stipulated that the total cost was $803,764.60. The fact that a part of this cost is made up of a claim which arose on account of an expenditure made prior to April 6, 1917, is immaterial. What cost the Coastwise Transportation Co. bore in the acquisition was not less than $803,764.60 and this entire amount was borne after April 6, 1917, namely on February 15, 1918. The petitioner's contention with respect to the first point must, therefore, be sustained.

The second point involves two questions: (1) The period over which the allowable amortization shall be spread, and (2) the manner in which the amortization shall be spread over the period decided upon.

As to the amortization period, the parties hereto have stipulated that the period ends February 28, 1919, and we have heretofore found in this opinion that the asset in question subject to amortization was acquired and costs borne on February 15, 1918. Consistent with the foregoing, we must hold that the amortization period extends from February 15, 1918, to February 28, 1919, and that the amortization should be spread over this period.

The second question is not so easy of solution. No argument was advanced by the Commissioner for the method used by him, so that we have only the computation made by him, and the argument advanced by the petitioner against the method used.

The statute is silent as to the manner in which amortization shall be spread, merely providing that " there shall be allowed a reasonable deduction for  *  *  *  amortization." So long, therefore, as the method adopted by the Commissioner provides for a reasonable allowance, it satisfies the statute and the fact that it may differ from some other device to accomplish the same result should not ordinarily be material. Our question is whether a reasonable result is obtained.

The computation which was made by the Commissioner was prepared in accordance with article 185, Regulations 45, which reads as follows:

Amortization period.—The amortization allowance shall be spread in proportion to the net income (computed without benefit of the amortization allowance) between January 1, 1918 (or if the property was acquired subsequent to that date, January 1st of the year in which acquired) and either of the following dates:

(a) If the claim is based on (1) of article 184, the date when the property was or will be sold or permanently discarded as a war facility; or (b) if the claim is based on (2) of article 184, the actual or estimated date of cessation of operation as a war facility.

All taxpayers claiming an allowance for amortization shall compute (or, to the extent that accurate computations can not be made, shall estimate) the amount of their net income for the period between January 1, 1918, and the dates specified above, and shall also compute (or estimate as above) that part thereof properly assignable to each of the calendar years falling within the amortization period; and the amount of income so computed or estimated shall be the basis for apportioning the amounts of amortization applicable to each of the calendar years affected. Taxpayers reporting on the fiscal year basis shall (a) in all computations based upon 1918 rates for fiscal years ending in 1918 and 1919, use the amount of such allowance apportioned to the calendar year 1918; (b) in all computations based upon 1919 rates for a year beginning in 1918 and ending in 1919, use the amount of such allowance apportioned to the calendar year 1919; and (c) in all computations for subsequent fiscal years, use the number of twelfths of the allowance apportioned to each calendar year falling within such fiscal year that there are months of such calendar year falling within such fiscal year.

Since the vessel on which amortization is being allowed was acquired subsequent to January 1, 1918, and since the petitioner reports on a fiscal year basis, objection is made to that part of the above-quoted article which would require the amortization period to be considered as beginning January 1, 1918, and also to the manner of allocating the allowance as between fiscal years.

The Commissioner's computation, for the fiscal year ended February 28, 1919, based on the allowance made by him of $208,834.50 is as follows:

| | |
|---|---|
| (a) Net income fiscal year 1918 before amortization adjustment $2,068,510.23 2/12 applicable to 1918 | $344,751.71 |
| (b) Net income fiscal year 1919 before amortization adjustment $2,724,568.43 10/12 applicable to 1918 | 2,270,473.69 |
| (c) Applicable to calendar year 1918 | 2,615,225.40 |
| (d) 2/12 of $2,724,568.43 applicable to end of amortization period Feb. 28, 1919 | 454,094.74 |
| (e) Total net income | 3,069,320.14 |
| (f) Percentage (c) to (d) [should be (e)] | .85205 |
| Total amortization allowable $208,834.50 x 85.205% equals amortization 1918 | 177,937.44 |

This produces an allowance of $177,937.44 which is deducted from the income determined for the fiscal year ending February 28, 1919, before making the computation of tax for that year at the 1918 rates,

and similarly this same deduction would be allowed in determining income subject to tax at the 1918 rates for the fiscal year ending February 28, 1918. The remaining amount of the allowance, or $30,897.06 is deducted from income before making the computation of tax at the 1919 rates for the fiscal year ending February 28, 1919, and similarly, ten-twelfths thereof would be allowed as a deduction in the determination of income subject to tax for the fiscal year ending February 28, 1920.

In this manner the Commissioner first apportions the income of the amortization period to the calendar years beginning January 1, 1918, and extending to the end of the amortization period. Next, he apportions the amortization allowance as follows: (a) The amortization deductible for the calendar year 1918 is that proportion of the total amortization allowance which the net income for the calendar year 1918 bears to the total income for the amortization period; (b) the amortization deductible for the calendar year 1919 is that proportion of the total allowance which the net income from January 1, 1919, to February 28, 1919, bears to the total net income of the amortization period.

The amortization thus apportioned to the respective calendar years is allowed as a deduction in the computation of tax as follows: (a) The amortization apportioned to the calendar year 1918 is allowed as a deduction in the determination of income subject to tax at the 1918 rates for the fiscal years ending in 1918 and 1919; (b) the amortization apportioned to the calendar year 1919 is allowed (1) as a deduction in the determination of income subject to tax at the 1919 rates for the fiscal year ending in 1919, and (2) ten-twelfths thereof is allowed as a deduction in the determination of income subject to tax for the fiscal year ending in 1920.

The purpose underlying this rather involved computation seems to have been to give the taxpayer the full benefit of the amortization deduction due him where the fiscal year was one beginning in 1917, for which no amortization deduction is allowable, since the Revenue Act of 1917 makes no provision for an amortization allowance. But in this attempt to allow an effective amortization deduction for the entire amount allowable—as to the necessity for which we express grave doubt—is the Commissioner allowing a reasonable deduction for amortization in the year on appeal? By following his method, it would be immaterial whether the vessel in question was acquired on January 2, or February 27, 1918; in any case where the amortizable asset was acquired after January 1, and before February 28 (where the fiscal year ends on the latter date), the amortization deduction for the fiscal year ending February 28, 1918, in a computation at the 1918 rates, would be the entire portion of the amorti-

zation apportioned to the calendar year 1918, even though the asset may not have been acquired until February 27, 1918, and, therefore, have been an income-producing factor for only a single day.

It further appears that in the case on appeal a part of the deduction in question would be allowed in the fiscal year ended February 28, 1920, when as a fact the amortization period ended February 28, 1919, and no war income was earned in this fiscal year.

Other difficulties in the application of the Commissioner's method could be pointed out, though those given will suffice to show that such a method is not in accordance with the rule laid down in the *Appeal of G. M. Standifer Construction Corporation*, 4 B. T. A. 525, where the Board approved the principle that the spread of amortization should be in accordance with income where the facilities or vessels produced income, and said:

> In order that taxpayers may have the full benefit of such a deduction and obtain a full measure of relief, it seems to us that the deduction should be allocated in accordance with the amount of the net income during the different periods before taking into consideration the amortization allowance. When relief is given by statute to a taxpayer by means of a deduction, that relief can be more adequately given by determining the amount of the deduction in each of the years in accordance with the income; otherwise, as in this case, a taxpayer may be required to expend large sums of money during a taxable year and, on account of the changes in its business conditions and other circumstances, may have no net income from which it can take a deduction or get the benefit which was intended to be given.

Likewise, see *Appeal of John Polachek*, 3 B. T. A. 1051.

Further, we are of the opinion that when amortization is being spread on the basis of income (a principle to which both parties are agreed) and a fiscal year is involved, it is unnecessary to resort to the method of first placing the deduction on a calendar year basis and likewise erroneous to consider in effect that an amortizable asset was acquired on the first day of a calendar year when in fact it was not acquired on that date. The purpose of the statute was clearly to allow the deduction for amortization against the war income which was produced while the amortizable asset was an income-producing factor.

The factors necessary for a determination of the spread of amortization on what we conceive to be the correct basis are available in this case. We have found that the amortization period begins February 15, 1918, and ends February 28, 1919, and the allowable amortization deduction is the difference between the total costs of the vessel in question of $803,764.60 and its residual value in postwar use of $490,168, or $313,596.60. The total income for the amortization period may be determined with a reasonable degree of accuracy by adding fourteen three hundred and sixty-fifths of the

total income for the fiscal year ending February 28, 1918, to the total income for the fiscal year ending February 28, 1919, using the income in both cases before making the amortization adjustment. The ratio which the income for the fiscal year ending February 28, 1919, before making the amortization adjustment, bears to the total income for the amortization period, as determined above, is the proper ratio to be used in determining the portion of the total amortization allowance which should be allowed as a deduction in a determination of net income for the fiscal year ending February 28, 1919, and this net income should be used in the computations of tax, both at the 1918 and 1919 rates.

In the *Appeal of G. M. Standifer Construction Corporation, supra,* and the *Appeal of John Polachek, supra,* where different questions were involved from the one here in issue, the Board held that article 185, Regulations 45, was a fair and reasonable interpretation of the amortization section of the statute. To the extent that these decisions may be considered in conflict with the holding in this case, they are hereby so modified.

Redetermination should be made consistent with the foregoing.

*Judgment will be entered on 15 days' notice, under Rule 50.*